GEORGE W. SLEEPER, Applicant for a rule to show cause why a writ of *mandamus* to restore should not issue, *v.* THE FRANKLIN LYCEUM.

Upon an application for a rule that a literary corporation should show cause why a writ of *mandamus* should not issue to the corporation, commanding them to restore to membership and the rights of membership an expelled member of the corporation, it appearing that the applicant had been a member, and first suspended from debate and afterwards wholly disfranchised; that the proceedings upon their face were irregular, and that a certain letter to the secretary, relied upon by the corporation as a ground for the suspension, and a certain circular to the officers and members of the corporation, as a ground for the expulsion of the member, were not before the court, the rule asked for was made absolute, but ordered the *mandamus* to issue in the alternative, either to restore the applicant to his membership and rights of membership, or, to show by the return to the writ, good cause to the contrary.

APPLICATION by George W. Sleeper for a rule to show cause why a writ of *mandamus* should not issue to the Franklin Lyceum, a literary corporation for debates, lectures, library, &c., commanding the corporation to restore him to the privileges of membership, upon the ground, that he had been illegally disfranchised of the same.

Upon citation to and appearance of the corporation, it appeared from the corporation minutes, that on the 6th day of October, 1862, as the minutes of the meeting recite, "A communication from Mr. George W. Sleeper, reflecting upon the officers and committees of the Lyceum, was read by the secretary, but not accepted by the Lyceum. On motion of C. A. Hoyt, Mr. Sleeper was suspended from the privileges of debate in the Lyceum until he should make a suitable apology for the above communication;" that at a meeting of the Lyceum, held on the 13th day of October, 1862, "on motion of Mr. George M. Daniels, Mr. Sleeper was allowed to speak in personal explanation, for ten minutes; at the expiration of that period the resolution of the previous meeting, suspending Mr. Sleeper, was revived in full force;" that afterwards, at the same meeting, "a motion was made and carried to reconsider the resolution of the previous meeting, whereby Mr. Sleeper was suspended. After a short debate the question was again put and carried unanimously in favor of suspension;" that at a meeting held on the 17th day of

November, 1862, Mr. George M. Daniels presented the following resolution :—

" Whereas, the Franklin Lyceum, in common with other well constituted societies, has an inherent right to do all acts necessary to preserve itself in a condition to fulfill and discharge the wise and beneficent purpose of its institution, and to prevent a perpetual disturbance of its tranquillity by the scandalous defamation and disorderly conduct of its members ; and, whereas, section 12th, article 1st, of the by-laws of this society provides, that any member shall be liable to expulsion for disorderly conduct ; and whereas, George W. Sleeper, a member, who by a vote of the Lyceum has been duly suspended from the privileges of debate, on account of gross breach of decorum, for which no excuse or apology has been tendered, has, at divers times since such suspension persisted in interrupting the debates upon the floor of the Lyceum, after repeated assurances from the presiding officer that he was not entitled to be heard, to the serious prejudice of the good order sought to be maintained ; and whereas, the said George W. Sleeper has issued over his own name a circular addressed to the members of the ̦Franklin Lyceum, in which he reiterates his defamatory and scurrilous expressions concerning this association, its officers and members, characterizing its proceedings as ' a farce,' ' done upon the principle of a mob,' ' the violence of brute force,' ' high handed outrage of an uncivilized mob ;' and otherwise seeking unjustly to attach odium and reproach to this society ; therefore,

" *Resolved*, That George W. Sleeper be, and hereby is, expelled from membership in the Franklin Lyceum ;" that this resolution was received and laid over until Monday, December 1st, 1862 ; that the minutes of the meeting further state, that at a meeting of the Lyceum held on the 24th day of November, 1862, Mr. Sleeper, in the course of debate on the regular question of the evening, attempted to speak, and being called to order by the members, appealed to the chair, who decided, that as a resolution had passed denying him the privilege of the floor, he was out of order ; that at a meeting of the Lyceum, held on the 1st day of December, 1862, Mr. William D. Hilton moved the passage of the following resolution :—

"*Resolved*, That the vote to suspend a member of the Lyceum, taken Wednesday evening, October 6th, 1862, be declared void;" which was lost; that on motion of Mr. Daniels, the preamble and resolution presented November 16th, 1862, providing for the expulsion of George W. Sleeper, and made the special order of the evening, were taken up, and after discussion, in which the circular issued by Mr. Sleeper was called for, and by vote of the Lyceum, read by the secretary, the vote upon the resolution of expulsion was taken and lost,—forty-two voting in the affirmative, and fifteen in the negative,—the 12th section of article 1st of the by-laws requiring a vote of three-fourths of the members present to pass a vote of expulsion; that thereupon, Mr. Phillips, who had voted in the affirmative, moved a reconsideration of the vote on the resolution, which the president ruled, for that reason, to be out of order, but was overruled upon appeal to the meeting, and the vote to reconsider was passed, and further action upon the resolution to expel postponed until Monday evening, December 8th, 1862; that at the meeting of the Lyceum, held on the 8th day of December, 1862, the resolution to expel George W. Sleeper was taken up, and the meeting having voted that the vote upon it should be taken at half-past nine o'clock, and that no member should speak more than five minutes, and upon motion, permitted Mr. Sleeper to speak, passed the vote of expulsion,— seventy-four voting in the affirmative, and twenty, in the negative.

The twelfth section of article first of the by-laws, upon which the vote of expulsion was founded, was as follows :—

"SECTION 12. Any member shall be liable to expulsion or dismission for disorderly or immoral conduct, or for neglecting, for two years, to pay his proportion of assessments or taxation; provided, always, that a motion to expel or dismiss a member shall be made at a regular meeting, two weeks previous to taking a vote thereon, and no member shall be expelled or dismissed except by the votes of three-fourths of the members present, at a regular meeting, due notice having been given to the delinquent of the motion pending; and it shall be the duty of the treasurer to report such delinquencies."

The sixth rule of order, adopted by the Lyceum, was,—

" When a motion has been made and carried in the affirmative or negative, it shall be in order for any member of the majority to move for a reconsideration of the same."

It further appeared, that Mr. Sleeper, protesting that the vote expelling him from the Lyceum was void, appeared at several meetings of the corporation, in the early part of 1863, and attempted to take part in its proceedings and debates, but was prevented by the meetings from doing so, on the ground that he had been expelled from the corporation.

The only evidence submitted to the court in respect to this motion for a rule to show cause, came from the applicant, consisting of a copy from the minutes of the Lyceum meetings, kept by its secretary, in support of his application, which was in writing, and sworn to by him.

*T. A. Jenckes, for the applicant :*—

I. This is a proper remedy for the relief sought. Angell & Ames on Corporations, Ch. 12, § 431, and cases there cited.; Ib. Ch. 20, § 704, and cases there cited.

II. The relator was unlawfully deprived of his rights and privileges as a corporator. From the records of the society, (October 6th, 1862,) it appears that the relator was suspended from the privilege of debate until he should make a suitable apology for a communication which was read by the secretary at that meeting. It does not appear that the relator addressed the communication to the corporation, or that he requested the secretary to read it, nor does the record show what the communication was, or in what manner it reflected (if at all) upon the officers or committees of the Lyceum. It does not appear by the records (record of meeting, November 17th, 1862,) that the association complained that the relator did not submit to the vote excluding him from debate, without protest, but claimed the floor for the purposes of debate at meetings between that, when the vote of suspension was passed, (October 6th,) and that of November 17th, when the resolutions of expulsion were offered. These resolutions for his expulsion set out two grounds therefor:

one, that he persisted in claiming the floor, notwithstanding the vote of suspension; and second, that he had issued a circular offensive to members of the association. On December 1st, 1862, the resolutions of expulsion were debated, and the vote being taken, they were declared lost. Thereupon, a member (not of the prevailing party) moved a reconsideration of the vote, which motion was declared out of order by the presiding officer, from which decision an appeal was taken, and the appeal sustained, and thereupon the further discussion of the motion to reconsider the resolutions of expulsion was postponed till December 8th. On that evening, the motion for reconsideration was put and declared carried; and thereupon a further discussion of the resolutions of expulsion took place, and upon a vote being taken, the resolutions were declared carried, and the relator was pronounced expelled. The relator and others of his friends protested against the action of the association, both on the appeal from the decision of the chair, and upon the passage of the resolutions of expulsion.

1. The vote of suspension was illegal. No sufficient cause is assigned for it, and there was no notice or hearing upon it as required. The power to suspend is included in the power to expel. Jefferson's Manual, 114, (N. Y. ed.); Cushing on Parliamentary Law, 32, 250, 251, 265, 268. The record does not show that it was passed by the requisite vote. There was no disorderly or immoral conduct alleged in the relator. See By-Laws of Lyceum, art. 1, § 12. How a member uttering words alleged to be disorderly is to be treated, see Jefferson's Manual, 714; Cushing, 671—686. 2. The suspension having been illegal, the relator's conduct in persisting against it, and claiming the floor for that purpose, is not disorderly. 3. Writing circulars concerning the society or its members, and reflecting upon the character or conduct of either or both, is not disorderly conduct as a member of the association. If any one is injured by such publications, the law affords an ample remedy. Such disorderly conduct as would authorize suspension or expulsion must take place at the meetings of the society, in the course of the transactions of the business of the society, and must be persisted in with the intent of disturbing or breaking up the meetings. Mere claiming, and insisting upon with earnestness, a right of which

the member has been illegally deprived, is not such disorderly conduct. The resolutions therefore allege no sufficient cause for expulsion. 4. The resolutions of expulsion having been lost, it was not competent for the numerical majority, not being the majority required by the by-laws of the corporation, to reconsider the vote, and have a further discussion, and call for another vote on the same resolutions. Jefferson, 151, 152, 164, 165 ; Cushing, pp. 505, 507, §§ 1264, 1269, 1270. The reconsideration and subsequent vote were therefore illegal and void, even if the resolutions had set forth sufficient cause.

III. The relator should have the relief asked for, and a peremptory *mandamus* should issue, commanding the defendant corporation to restore the relator to his rights as a corporator.

*Thurston & Ripley, for the respondent :—*

It becomes unnecessary to consider the question of the propriety of the vote of the society of October 6th, 1862, suspending the relator from the privileges of debate, inasmuch, as, if the subsequent proceedings of the society on December 8th, 1862, *expelling* him from the society, are sustained, there is no aid which the court can give to the petitioner by reason of any irregularity accompanying the vote of suspension. The question at issue upon the vote of expulsion is simply this : Was the vote passed in accordance with the constitution, by-laws, and governing rules of the Lyceum ? If it was, the relator was properly expelled ; if it was not, he is entitled to be restored to his privileges as a member of that body.

I. Did the relator make himself amenable to the provisions of section 12 of the by-laws, relating to the grounds for which a member may be expelled ? He addressed an offensive communication to the secretary in his official capacity, which was intended by him to be read by the secretary to the meeting. It was so read by that officer, at a meeting at which the relator was present. This communication reflected upon the society, and the manner in which it was communicated—through the secretary and with the intent that it should be read at a public meeting—was a clear contempt of the society, and brings his conduct within the definition of the term " disorderly." Disorderly conduct does not consist solely in the use of loud and offensive words. It may

consist in gestures or in grimaces, or in contumacious silence when bound to speak, or in any other conduct which is in violation of decorum, and is provocative of disturbance. In this instance, it was a fire-brand thrown by the relator, and could have been thrown with no other object than to kindle a conflagration. The society took notice of this conduct, and suspended the relator from the privilege of debate until he should apologize for his conduct. The power to punish a contempt is within the proper powers of a deliberative body and of a society of this character, and it was competent for the society to suspend the relator until he should apologize. If his conduct was disorderly in presenting this communication, he was properly suspended; and while this vote was in force, and the offence not expiated by an apology, he had no right to persist in the privilege of debate. He did not apologize, and did, in defiance of the vote of the society, insist upon claiming the floor for the exercise of the right which he, by the proper vote of the society, had been deprived of. Further than this, he issued an offensive circular.

If either of the grounds stated in the resolution of expulsion are sufficient, the relator cannot complain that another ground for the action of the society was also stated in the resolution which is insufficient. It is claimed, that persisting in an effort to enjoy the privilege of debate while the vote was in force is disorderly conduct, and as the by-laws do not define (§ 12) in what disorderly conduct shall be deemed to consist, it is left to the judgment of the society, who can decide for themselves what is, and what is not, conduct of that character. The society held that his conduct, on this occasion, was disorderly; and this conduct was often repeated. (Record of November 17th, 1862.) He was called to order repeatedly, but still persisted, and thus violated the express rules of order for the government of that body, which requires the members to sit down. December 1st, 1862, the resolution of expulsion came up for action, and required for its passage the vote of three-fourths of the members present. The requisite number did not vote in favor of expulsion, though a *majority* of the members present did so vote. A member of the Lyceum voting with the numerical majority in favor of the relator's expulsion moved a reconsideration of the vote. The pre-

siding officer held that the motion was not in order, interpreting the sixth rule, on the subject of reconsideration, to require that the motion should come from the prevailing party, which, in this case, was the numerical minority. An appeal was taken from this decision, and the society overruled the chair. The question was then referred until December 8th, when the vote was reconsidered, and the relator expelled by a three-fourths vote. It becomes necessary to inquire whether the motion to reconsider was properly made. The rule is in these words: "*Sixth.* When a motion has been made and carried in the affirmative or negative, it shall be in order for any member of the majority to move for a reconsideration of the same." What is the meaning of the word "*majority*," as here used? In the absence of any rule on the subject, this motion to reconsider can be made by any member, and be decided like any other question. Cushing's Manual, § 1266. It will be observed that the rule does not say, the "prevailing party," but the "majority." Ordinarily, and with great propriety, the rules on this subject specify that the motion shall come from the prevailing party, but without the least violence to the language of this rule, it may be interpreted the other way. Very probably the framer of the rule intended to use the word majority in the sense of "prevailing party," but this is immaterial even if the intent could be established; it is a question of the meaning of *language as used.* In a case of ambiguity in the meaning of a rule, *the society are the proper interpreters of its meaning.* It is within their power to alter their by-laws, upon notice and upon a two-thirds vote; and to suspend a rule of order at any time upon a two-thirds vote. This appeal was not for the purpose of altering the by-law, but for rightly interpreting it. The society, in effect, said, by their decision on this appeal, that the word "majority" was to be taken and understood in its proper and ordinary acceptation, and did not, in any case, mean the *minority.* Usually it happens that the majority are the prevailing party, and if the rule had used the latter words, the society would have been bound by it; but as these words are not used, it is not for the courts to supply them, or to say that this word "majority" is not, according to all rules of interpretation, to be taken in its primary and usual acceptation, especially after

the society for whose government it was framed have decided as to its meaning. For these reasons, we submit that the expulsion of the relator, on the 8th of December, 1862, was for a proper cause, upon an offence committed within section 12, and upon regular proceedings.

AMES, C. J. The proceedings of this corporation which first partially, and then wholly, disfranchised the applicant as a member, were certainly irregular,—the vote suspending his right to debate having been passed without notice to him, or, so far as appears, allowing him opportunity of defence; and the vote of expulsion, without the notice required by the twelfth section of article first of the by-laws. We have not before us the main causes of this action against the applicant, neither his letter to the secretary of the corporation, alleged as the ground of the vote suspending him from the right to debate, nor his circular, afterwards addressed to the officers and members of the corporation, which seems to have been one of the grounds of the vote of expulsion. Under these circumstances, and as the applicant was a member of this corporation and has been disfranchised, we shall make the rule, prayed for by the applicant, absolute; but in order to enable the corporation to set out in their return to the writ, specifically, the grounds of their action, the rule must be, that the writ issue in the alternative, either, to restore the applicant to his membership and rights of membership, or to show good cause to the contrary.